# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

  -vs-                                            Cr. No. 17-1105 JCH

TYRONE CORIZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Tyrone Coriz's Motion to Suppress Statement (ECF No. 31). The Court held hearings on the motion on June 14, 2018 and August 21, 2018. Defendant asserts that his statement must be suppressed because he invoked his Fifth Amendment right to remain silent and terminate the interrogation, yet Special Agent Jennifer Sullivan failed to honor his rights. Defendant additionally contends that his statement must be suppressed because the Government cannot meet its burden to show his confession was voluntary because Special Agent Sullivan misrepresented material facts, promised treatment in lieu of incarceration, threatened him, and ignored his attempts to end the questioning and make a phone call, resulting in psychological coercion that overbore his will. The Court, having considered the motion, briefs, evidence, argument, and otherwise being fully advised, concludes that the motion to suppress must be granted on the grounds that Special Agent Sullivan violated Defendant Coriz's Fifth Amendment right to end the interrogation when she failed to scrupulously honor Defendant Coriz's unequivocal right to remain silent, and the resulting

confession, based on the totality of the circumstances, was not voluntary.

## I.    FACTUAL FINDINGS

For the purposes of the motion before the Court, the Court finds the facts as follows:

At the time of the interview in question, Tyrone Coriz ("Coriz" or "Defendant") was a 45-year old man who completed the 11th grade and was previously a tribal official whose duties included assistant to the war chief with San Felipe Pueblo. *See* June 14, 2018 Hr'g Tr. 12:25-13:11 & 26:7-14; *compare* Gov.'s Hr'g Ex. 9, *with* Def.'s Mot. 15, ECF No. 31.

In 2002, a Bureau of Indian Affairs ("BIA") agent investigated Mr. Coriz regarding an allegation of sexual assault, and after giving a couple of statements, Mr. Coriz said he did not want to participate in the interview further. *See* June 14, 2018 Hr'g Tr. 11:10-12:19. Special Agent Bourgeois investigated another allegation of sexual assault in 2006 against Coriz. *See* June 14, 2018 Hr'g Tr. 12:23-17:9. Special Agent Bourgeois interviewed Coriz after his arrest and read him an FD-395 Advice of Rights form, which Mr. Coriz appeared to understand. *Id.* 14:7-15:6. Coriz spoke to Special Agent Bourgeois, but then discontinued the interview by saying he no longer wished to talk. *See id.* 15:14-17:9. Accordingly, Coriz was familiar and understood his *Miranda* rights based on his prior experience with the criminal justice system.

BIA Agent James Jojola ("Jojola") conducted an investigation of Coriz regarding new allegations against Coriz of sexual assault, and arranged a date for Coriz to come to the Federal Bureau of Investigations ("FBI") office in Albuquerque to undergo a polygraph test. *See* June 14, 2018 Hr'g Tr. 22:23-23:25; Gov.'s Hr'g Ex. 1. On May 24, 2016, Coriz came to the Albuquerque FBI office voluntarily on or around 9:00 a.m. after getting a ride with his girlfriend *See* June 14, 2018 Hr'g Tr. 23:10-24:21, 35:13-15; Gov.'s Hr'g Ex. 6 (Consent to Interview Form). Special Agent Jennifer Sullivan ("Sullivan") conducted the test. June 14, 2018 Hr'g Tr.

22:18-20. Sullivan met Coriz and Jojola in the lobby and walked them back to the polygraph room where she gave Coriz an overview of what they were going to do that day. *See* June 14, 2018 Hr'g Tr. 23:24-24:7.

Jojola left, and then Sullivan discussed with Coriz a consent form to give her written permission to take the polygraph and a second form advising him of his *Miranda* rights. *Id.* 24:6-25:7. Coriz signed the "Consent to Interview with Polygraph" form at 9:19 a.m. and the "Advice of Rights" form at 9:29 a.m. prior to the test. *Id.* 25:12-17; Gov.'s Hr'g Ex. 5 & 6. Sullivan then asked personal history information of Coriz. June 14, 2018 Hr'g Tr. 25:20-26:4. She explained the questions she was going to ask to ensure he understood the vocabulary she would use, the testing equipment and devices she would use, and what the polygraph test monitors and records. *Id.* 29:2-30:4, 31:23-32:12. Sullivan then placed Coriz in a chair and put the equipment on him, re-explaining as she went what each piece of equipment did. *See id.* 32:13-15. The pre-test took about 90 minutes. *See id.* 83:16-85:8.

Sullivan was trained in and used the FBI MGQT polygraph test, a variant of the federally approved Air Force MGQT. *See id.* 21:25-22:3, 156:11-21. The FBI MGQT test is designed to be more conservative to increase the likelihood that an innocent person may be deemed inconclusive in order to minimize the likelihood of a guilty person passing the test. *Id.* 157:7-24; August 21, 2018 Hr'g Tr. 15:15-16:13.

Sullivan went over each of the eight questions on the test: two relevant questions, two control questions, three irrelevant questions, and a sacrifice relevant question. *Id.* 32:24-33:4. Sullivan asked two relevant questions during the testing: "In the last year did you ever touch [Jane Doe's] vagina?" and "In the last year did you ever touch [Jane Doe's] vagina inside Albert's house?" *Id.* 30:22-31:14; Gov.'s Hr'g Ex. 7 (Polygraph Examination Report) at 4 of 4.

The questions Sullivan used met the standards of the polygraph profession. *See* June 14, 2018 Hr'g Tr. 161:8-162:12, 164:23-165:13; August 21, 2018 Hr'g Tr. 33:16-23.

During the polygraph test, Sullivan conducted three separate charts using the exact same questions moved around in different ways. *See* June 14, 2018 Hr'g Tr. 31:15-22. The polygraph test, including the three charts and practice test, took approximately 30-35 minutes. *See id.* 33:11-14. Sullivan began Chart 1 at about 11:02 a.m. and finished Chart 3, ending the polygraph test, at about 11:14 a.m. *See id.* 85:7-8, 98:7-17.

Sullivan scored the test after each chart. *See id.* 96:6-9. The cardiovascular reading in Coriz's polygraph chart revealed that he had premature ventricular contractions ("PVCs") during the test, which are defects in the heart rhythm, and it is best practice not to consider the cardio measure on a polygraph chart when PVCs are present. *See id.* 66:22-68:8, 69:20-74:19, 186:17-21, 187:24-188:17; August 21, 2018 Hr'g Tr. 24:16-26:1. Sullivan scored the cardiovascular reading, despite the presence of PVCs, and scored the test as deception indicated. *Compare* June 14, 2018 Hr'g Tr. 69:20-74:19, 93:25-94:5, *with* Def.'s Ex. A, C-E. Numeric scoring of Coriz's charts would not result in accurate results in light of the presence of PVCs and "messy," poor quality physiological data. *See* June 14, 2018 Hr'g Tr. 178:17-179:7, 180:7-15, 186:14-16; August 21, 2018 Hr'g Tr. 23:11-18. Numerical analysis is preferred when possible, and FBI policy is typically not to use a global analysis, which is a subjective test that is not scientifically valid. *See* June 14, 2018 Hr'g Tr. 186:8-13; August 21, 2018 Hr'g Tr. 22:23-23:6. If Sullivan's cardio scores were not factored into her analysis, the numeric score from her results using her scoring method would have resulted in an inconclusive score. *See* August 21, 2018 Hr'g Tr. 37:10-38:16, 48:14-18. *See also* Def.'s Ex. N ¶ 23 ("Had SA Sullivan followed current Federal scoring practices and not scored the PVC recoveries as responses her outcome, then even with

4

the biased FBI decision practices the Coriz Examination would have resulted in an inconclusive outcome."). Accordingly, Sullivan's conclusion of deception indicated was inaccurate using her numeric scoring system; a more accurate conclusion from her results and scoring method should have been inconclusive. *Compare* June 14, 2018 Hr'g Tr. 94:18-94:23, with August 21, 2018 Hr'g Tr. 37:10-38:16. Even with an inconclusive test result, FBI procedure is to conduct a post-test interview. *See* June 14, 2018 Hr'g Tr. 94:24-95:11, 160:15-161:2, 194:6-14.

Despite the polygraph test results being inconclusive under her scoring method, at the end of the test, Sullivan got up and told Coriz that he failed the test, so she took off the equipment and started the post-test interview. June 14, 2018 Hr'g Tr. 33:23-34:12, 104:12-17. Sullivan video and audio recorded only the post-polygraph interview. June 14, 2018 Hr'g Tr. 35:25-36:12; Gov.'s Hr'g Ex. 1 (Video Recording ("Video")) & Hr'g Ex. 2 (Enhanced Audio Recording ("Enhanced Audio")). Coriz had water and Sullivan offered him food during the test. Video 1:23-2:10[1]; Gov.'s Ex. 4 ("Interview Tr.") at 2. Sullivan confronted Coriz with the results of the polygraph, telling Coriz he failed the test, he was not even close, and the polygraph says what is inside his body. *See* Video 1:23-4:55; Interview Tr. 2:6-4:6.

At 12:40 running time, when Sullivan was asking Coriz about a report involving allegations against him, Coriz said that he does not want to talk anymore. *See* Video 12:40-12:46. Sullivan asked why they would make it up. *Id.* 12:46-12:50. Sullivan continued to interrogate Coriz. *See id.* 12:50-13:49.

At 13:49 running time, Coriz said, "I don't want to argue no more. If they really want me that bad and they want to throw away the key at me, fine." Video 13:49-13:54. Sullivan responded, "Are you telling me that when James or the BIA or whoever…" *Id.* 13:54-58. Upon

---

[1] Unless otherwise noted, the Court cites to the Video and Enhanced Audio using the recorded running time, rather than the time stamp.

review of the Video and Enhanced Audio, the Court finds that the audio is not inaudible and that Coriz interrupted her and said: "I have nothing more to say." *Id.* 13:58-14:01. Sullivan replied, "OK." *Id.* 14:01-14:02. Coriz continued talking, saying, that he knows in his heart he is telling the truth. *See id.* 14:02-14:13. Sullivan stated, "You realize it's not going away. I mean, you get that, right." *Id.* 14:13-14:16. Coriz said that is fine, if they want him gone that bad, my own family, and he continued to talk. *See id.* 14:17-15:09. The interview resumed with Sullivan responding and asking more questions. *See id.* 15:09-17:49.

Sullivan had Coriz read a paragraph in one of the reports of prior incidents, which he did aloud, and she asked why she would make it up. *Id.* at 17:49-18:40. Upon review of the Video and Enhanced Audio, the Court finds that the audio is not inaudible and that Coriz said, "I don't need to say anymore." Video at 18:46. Sullivan replied, "All right." Video 18:46. She tossed the report down on the floor, and continued, "Just so you know, it's not going away." *Id.* 18:46-18:48. Coriz responded, "Yeah. But." *Id.* 18:50. Sullivan then said, "That's the thing. So once the community learns that you failed the polygraph test, they probably are not going to be that impressed with what's going on." *Id.* at 18:47-18:58. Defendant said that's their opinion. Id. at 18:58-19:01. Sullivan replied the "BIA is going to have to really continue enforcing their investigation." *Id.* at 19:03-19:08. Coriz responded, "Well, that's fine" and said something else inaudible. *See id.* at 19:08-19:13. Sullivan said, "Well, here's the deal. You came here to clear your name and your name is not cleared. That's what I'm telling you." *Id.* at 19:12-19:16. Coriz started to say something and Sullivan continued, "Well, let me talk. So I don't have to ask you any questions. You don't have to talk. If you're done talking, quit talking. That's fine." *Id.* 19:16-19:26. Sullivan understood that Coriz had expressed his desire not to talk to her anymore.

She then discussed how there were seven people saying this. *See id.* 19:26-19:37. Coriz

said that he wanted to see the victim's polygraph results. *Id.* 19:54-:56. Sullivan asked why he should see her polygraph, stating that she would not look at his. *See id.* at 19:27-20:12. Sullivan then stated: "It doesn't really matter because, remember, you're done with this. You don't have anything more to say. You don't know why you failed the polygraph. You got nothing to say." *Id.* 20:12-20:20.

Sullivan then discussed his problem is when the victim gets on the stand and the other witnesses get on the stand. *See id.* at 20:20-20:59. She then talked about his new family, how he had his own daughter, that if this was a sickness or behavior he can't help, then he needed to prove to these people that he wanted help. *See id.* at 20:59-22:59. Sullivan warned that Jojola is going to sit down with his wife and tell her about all the victims in the past, unless he has a problem and wanted to fix it, then that is a different story. *See id.* at 22:57-23:30. She stated that she is going to get Jojola, tell him he failed, and it can go one of two ways – he can continue to deny it or he can take responsibility, get help, cooperate, and try to stay out of prison, if he can. *See id.* at 23:33-23:59.

She then said it's a pattern and discussed how people get help, get therapy and counseling, that there are resources and programs for getting help. *See id.* at 24:15-29:59. Coriz remained silent after Sullivan told him to let her talk, and he began re-engaging in the conversation at 29:19 in the Video. *See id.* Sullivan continued to urge him to get help by admitting to his shortcomings, and Coriz began responding to Sullivan's questions. *See id.* 29:19-47:17.

At around 48:16 into the recording, the Court finds that Coriz said, "I just want to talk to my girlfriend." *Compare id.* 48:16-23, *with* Enhanced Audio 48:16-23. In response, Sullivan stated: "Here's the only thing I have to say about that … I understand why you need to call

Rolanna. I get it." *Id.* 48:14-48:40. Coriz responded that he wanted to talk to her, but Sullivan replied that once he walks out of here, she can't help him, she can't defend him, and she can't sit next to him. *See id.* 48:40-48:52. He again expressed wanting to call her, Sullivan responded that he is just going to worry her, and Coriz became visibly frustrated and upset. *See id.* 48:52-49:26. Sullivan continued interrogating Coriz, going through prior reports with him. *See id.* at 49:26-59:48.

After about an hour into the recording, Sullivan raised her voice and said that she will leave it like that because he is not trying to get help; she told him the difficulties victims go through and how they are getting counseling; and she said that he can't be a decent dad until he gets help, that she will help him, but he should not spin this, and that he should write an apology to each girl for crossing the line; and she said that he better hope that his daughter doesn't end up like one of these girls. *See id.* at 1:03:32-1:08:15. Sullivan then stated that if he wanted to go to the lobby and call his girlfriend and get a ride home, great, but if he wanted to get her (Sullivan) and James (Jojola) in his corner, she would stay, but he cannot have it both ways. *See id.* 108:22-39. Coriz responded that he was so young back then. *Id.* at 1:08:40-50. Sullivan replied that it was just wrong, and that if he wanted her help, she would hang with him, and then she suggested again he write apology letters, because he needed help and needed a psychologist. *See id.* 1:09:13-1:11:37.

Coriz began confessing to touching the victims from the reports. *See id.* 1:12:48-1:19:35. Per Sullivan's suggestion, he wrote five letters of apology, one to each victim. *See id.* 1:20:48-1:29:34. Sullivan suggested certain content for the letters, which he used in writing the letters. June 14, 2018 Hr'g Tr. 49:19-25, 133:7-138:25. *Compare* Hr'g Ex. 4 *with* Def.'s Ex. I-M. The post-polygraph interview lasted approximately two hours. *See* June 14, 2018 Hr'g Tr. 37:10-13.

The interview ended around 1:30 p.m., so Coriz was at the FBI office a total of approximately four and a half hours. *See id.* 54:5-15.

## II.    ANALYSIS

The Fifth Amendment states: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V.  Relying on the Fifth Amendment, the Supreme Court has held that if police take a suspect into custody and interrogate him, they must inform him of his *Miranda* rights or his responses cannot be introduced into evidence at trial to establish his guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). A statement may be deemed involuntary even if a suspect has been given his *Miranda* rights and properly waived them. *See United States v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006). "But cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer*, 468 U.S. at 433 n.20. The government bears the burden of showing by a preponderance of the evidence that the confession is voluntary.  *Lopez*, 437 F.3d at 1063.

In this case, Defendant signed and understood the Advice of Rights form, so the Government has met its burden to show that Sullivan provided Coriz with the requisite *Miranda* warnings before the interview began and that he initially waived the right to remain silent.

### A.    Invocation of Right to Silence

A suspect who has waived his *Miranda* rights may contradict the waiver "by an invocation at any time." *Berghuis v. Thompkins*, 560 U.S. 370, 387-88 (2010). If a suspect invokes his right to remain silent at any point during questioning, "further interrogation must cease." *Id.* at 388. The Supreme Court in *Davis v. United States*, 512 U.S. 452 (1994), "held that custodial interrogation may continue unless and until a suspect actually invokes his right to

counsel; ambiguous or equivocal statements that might be construed as invoking the right to counsel do not require the police to discontinue their questioning." *United States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006) (italics in original) (citing *Davis*, 512 U.S. at 458-59). Determining whether a suspect has invoked his right to counsel is an objective inquiry in which a court looks at whether the suspect's statement is sufficiently clear that a reasonable officer would understand the statement to be a request for an attorney. *Id.* (quoting *Davis*, 512 U.S. at 459). The Tenth Circuit has joined every other circuit to have addressed the issue squarely in concluding that *Davis* applies to both the right to counsel and the right to remain silent. *Id.* at 1211-12.

The rigid prophylactic rule requiring all questioning to cease upon a suspect's invocation of his right to counsel "is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Davis*, 512 U.S. at 458 (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)). A suspect's right to cut off questioning must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). "If an individual expresses his desire to remain silent, all interrogation must cease." *United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006).

Defendant asserts that he unambiguously invoked his right to remain silent more than once. The Government argues that the video is inaudible and he did not clearly invoke his rights. Despite that the transcript states "inaudible" at virtually all the crucial moments in the interview, the Court finds that the video and enhanced audio evidence is audible at the critical portions upon careful review. Defendant invoked his right to silence three separate times: first, at 12:40 to 12:46 running time, Coriz says that he does not want to talk anymore; second, at 13:58 to 14:01, Coriz said, "I have nothing more to say;" and third, at 18:46 Coriz said, "I don't need to say

anymore." Coriz's statements are clear and unequivocal.

The Government suggests Sullivan may not have heard Coriz, but the video provides strong evidence to the contrary, particularly after his invocation at 18:46 when in response to Coriz's statement, Sullivan drops her report and says, "Just so you know it's not going away…That's the thing. So once the community learns that you failed the polygraph test, they probably are not going to be that impressed with what's going on." Video 18:47-18:58. Sullivan also indicated a bit later her understanding of his earlier statement when she says: "Well, let me talk. So I don't have to ask you any questions. You don't have to talk. If you're done talking, quit talking. That's fine." *Id.* 19:21-19:26. She acknowledged shortly thereafter: "It doesn't really matter because, remember, you're done with this. You don't have anything more to say. You don't know why you failed the polygraph. You got nothing to say." *Id.* 20:12-:21. Sullivan's testimony that she does not know what he said during the critical "inaudible" portions is not credible based on her own words captured clearly in the recording or any good faith review of the video and enhanced audio recordings.

Although it is an objective test, the fact that Sullivan construed Defendant's statement as an invocation by dropping the report, telling him it isn't going away, as well as later acknowledging he did not need to talk, suggests that a reasonable officer would likewise consider the statement he made to be a clear invocation of his rights. From the entire context, the Court concludes Defendant unambiguously invoked his right to remain silent. "Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." *Smith v. Illinois*, 469 U.S. 91, 98 (1984). An "accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked." *Id.*

## B.      Waiver of right to silence

Police may only reinitiate questioning if four conditions are met:

> (1) at the time the defendant invoked his right to remain silent, the questioning ceased;  (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation [is] unrelated to the first.

*Id.* (citing *Mosley*, 423 U.S. at 104-05). If, however, the suspect, and not the police, reinitiates further discussion and agrees to questioning, then a defendant's right to remain silent is not violated, so long as the government did not coerce him into doing so. *Id. See also United States v. Santistevan*, 701 F.3d 1289, 1294 (10th Cir. 2012) ("It is well settled that a defendant, who has previously invoked the right to counsel, may change his mind and speak with police so long as the defendant '(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.'") (quoting *Smith*, 469 U.S. at 95). The Supreme Court has emphasized, however, "that a valid waiver 'cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation.'" *Smith*, 469 U.S. at 98 (quoting *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)).

The Government argues that Defendant never completely withdrew from the discussion, because he continued to talk to Sullivan. Although a defendant may reinitiate communication and negate the invocation of his right, the Court should consider whether law enforcement took an active role in continuing the interview or moved to end the encounter. This Court's extensive analysis in *United States v. McCluskey*, 893 F.Supp.2d 1117 (D.N.M. 2012) illuminates the issue here of whether Coriz initiated further exchanges with Sullivan:

> Thus, the question before the Court is whether McCluskey initiated further "communication, exchanges, or conversations" with Rominger after he invoked his right counsel. *See Edwards*, 451 U.S. at 485, 101 S.Ct. 1880. For guidance, the Court turns to decisions from the Supreme Court and the Tenth Circuit discussing similar issues. In *Edwards*, the defendant invoked his right to counsel,

but the next morning detectives appeared at the jail, where the detention officer told the defendant that he "had to" speak with police and took the defendant [to] meet with the detectives. *Id.* at 479, 101 S.Ct. 1880. Thus, *Edwards* presented a clear case where the defendant did not reinitiate further communication with police.

In *United States v. Rambo*, 365 F.3d 906 (10th Cir. 2004), the defendant was taken into custody on suspicion of committing armed robberies, and his interrogation was videotaped. At the beginning of the interview, the officer told Rambo that a lot of the responsibility for the crimes would be on his shoulders, and that he did not want to put more responsibility on Rambo's female accomplice than need be. *Id.* at 908. After Rambo asked whether his accomplice would be released or remain in jail, the officer said, "I don't know. [pause] You know if you want to talk to me about this stuff, that's fine." *Id.* After Rambo inquired again about the welfare of his accomplice and her children, the officer again asked, "Do you want to talk to me about this stuff?" and Rambo responded, "No." *Id.* This was an unambiguous invocation of the right to remain silent. However, the officer did not terminate the interview. Instead, he responded, "You don't? [pause] OK. [long pause] That's fine. [pause] But that's what you're getting charged with." *Id.* The officer then proceeded to attempt to coax Rambo to talk by informing him that other law enforcement agencies would be involved, and that "If you think back over the last two months since you've been out of prison, all the shit you've been involved in. Think about this. Think about the towns that are going to want to talk to you, ok? Or that have stuff on you." *Id.* At that point, Rambo began to talk about his lack of involvement in certain crimes, so the officer interrupted him and said, "Before we get into this stuff, Chris, I gotta know if you want to talk to me ... I can't sit here and talk with you like this if you don't want to talk to me. So do you want to talk to me?" *Id.* Rambo assented, and the officer informed him of his *Miranda* rights. *Id.* at 909. Then, Rambo confessed his crimes. *Id.* The Tenth Circuit rejected the government's contention that it was Rambo who reinitiated communication after invoking his right to remain silent:

> That argument ignores Moran's active role in continuing the interview after Rambo invoked his rights. When Rambo stated that he did not want to discuss the robberies, Moran made no move to end the encounter. Instead he acknowledged Rambo's request, but told Rambo that he would be charged with two aggravated robberies and that other agencies would want to speak with Rambo. Those comments reflect both further pressure on Rambo to discuss the crimes and a suggestion that despite Rambo's present request to terminate discussion of the topic, he would be questioned further.

*Id.* at 911. Thus, the Tenth Circuit concluded that the defendant's capitulation and agreement to talk to police was not at his own behest but rather was a product of the improper interrogation that continued after he invoked his right to silence. *Id.*

That is essentially what happened in this case. Here, McCluskey unambiguously invoked his right to counsel both at the beginning and in the middle of the interview. In neither instance did Rominger terminate the encounter. Instead, he proceeded to attempt to elicit an incriminating response from McCluskey by urging him to make a statement that would protect Welch. And it was this persistent, improper continued interrogation that persuaded McCluskey to agree to talk if Welch told him to do so. To reach any other conclusion, this Court would have to "ignore [Rominger's] active role in continuing the interview after [McCluskey] invoked his rights."

The other cases the Government cites do not alter this conclusion. In *United States v. Glover*, 104 F.3d 1570, 1580–81 (1997), the Tenth Circuit held that the defendant's confession was admissible where the individual in custody, rather than the police, initiated further discussion after the defendant invoked his right to counsel. There, the police arrested Glover and advised him of his *Miranda* rights. *Id.* at 1575. Glover indicated that he did not want to talk, and the officers immediately ceased questioning him. *Id.* The police then questioned Glover's co-defendant, who was not in custody. *Id.* After obtaining her statement, one officer approached Glover but a second officer immediately intervened and reminded him that Glover had invoked his rights. When the officers began to discuss which particular right Glover had invoked, Glover reminded them that he had invoked his right to silence, but then he stated that he now wanted to talk. *Id.* The officers began to interrogate him and did not readvise him of his *Miranda* rights. *Id.* The Tenth Circuit concluded that Glover, rather than the police, had initiated the further discussion that led to his confession. *Id.* at 1581. The Court reasoned that after Glover invoked his right to silence, police ceased all questioning and it was only later, after the confusion over which *Miranda* rights he had invoked, that Glover himself volunteered that he wished to talk. *Id.* This subsequent willingness to talk, the court noted, did not stem from improper interrogation by the police. *Id.*

….

*Edwards*, *Rambo*, *Glover*, and [*United States v. Alexander*, 447 F.3d 1290 (10th Cir. 2006)] persuade the Court that under the facts of this case, McCluskey did not validly reinitiate contact with Rominger after invoking his right to counsel. While it is true that it was McCluskey's own suggestion that he would talk if Welch told him to do so, he made that suggestion only after Rominger continued to interrogate him after he twice invoked his right to counsel. It is undisputed that McCluskey invoked that right and that, despite the invocation, Rominger did not terminate the encounter. As the Court has explained, Rominger continued not only to "explain the benefits of cooperation," (as the Government characterizes it), but also to interrogate McCluskey. It was only after—and as a result of—that continued interrogation that McCluskey offered to confess if Welch directed him to do so. It is this type of pressure to acquiesce that *Edwards* is intended to prevent….

…In that regard, this case is similar to *Rambo*, in which police did not terminate the interview when the defendant invoked his Fifth Amendment rights, but instead continued to interrogate him through means other than express questioning until he agreed to speak to them. Here, McCluskey did not agree to talk to Rominger at the direction of Welch until after Rominger improperly interrogated him.… Further, this case is distinguishable from *Glover* and *Alexander*. In both of those cases, unlike here, the police immediately ceased their interrogation when the defendant asserted his Fifth Amendment rights. In *Glover*, it was the defendant who, long after the interrogation ended, offered to speak to police. And in *Alexander*, the FBI ceased questioning the defendant when he asserted his rights, and his reinitiation of the interrogation was the product not of continued questioning, but of independent persuasion by his co-defendant.

*McCluskey*, 893 F.Supp.2d at 1140-43. This Court found a significant distinction between the cases in which the police immediately halt their interrogations after the invocation of *Miranda* rights, and the contrary situation in *McCluskey* in which the interrogation did not cease. *See id.* at 1143-44. The Court thus concluded that McCluskey did not initiate further conversation, as required to avoid suppression under *Edwards*. *See id.* at 1144.

Turning to the facts of this case, Sullivan did not cease her questioning after any of the three invocations of Coriz's right to silence. There was no substantial interval between each of Defendant's invocation and Sullivan's continued questioning and commentary. Sullivan did not give Coriz a fresh set of *Miranda* warnings, and the subjects of the interrogation before and after the invocations were related. Consequently, the four-factor test in *Mosley* has not been met to permit Sullivan to reinitiate questioning.

As to whether Coriz reinitiated communication, after the first invocation, Sullivan asked why they would make it up. *See* Video 12:46-12:50. After the second invocation, Sullivan replied, "OK," *id.* 14:01-14:02, and when Coriz continued by saying that he knows in his heart he is telling the truth, *see id.* 14:02-14:13, Sullivan stated, "You realize it's not going away. I mean, you get that, right." *Id.* 14:13-14:16. Sullivan did not attempt to cut off the interview immediately, but instead, coaxed Defendant to cooperate. After the third invocation, Sullivan

applied even more pressure when she said it wasn't going away and suggested the community would be upset with him. Defendant responded to that comment, with "Yeah, well, that's your opinion." When Sullivan said the BIA would continue its investigation, Coriz responded, "That's fine. That's fine." Although Coriz spoke, his statements were in response to pressure by Sullivan and did not suggest that he was changing his mind about speaking with Sullivan. Rather, those comments indicated that, despite what Sullivan said, it was "fine" and he would rather not talk.

Sullivan then continued pressuring him saying he did not clear his name, told him not to talk, and then explained to him the strength of the government's case against him. Although Coriz brought up wanting to see the alleged victim's polygraph results, this request occurred after he invoked his right to silence, and after Sullivan pressured him, which as in *Rambo*, amounted to a suggestion that despite his earlier request to remain silent, he would be questioned further. Moreover, a significant degree of coercion or the egregiousness of police conduct is not the standard to use after the invocation of the right to counsel. In *Rambo*, the officer merely coaxed the suspect to waive his invoked right to silence, yet the Tenth Circuit suppressed Rambo's statements. *See Rambo*, 365 F.3d at 908-11. Rather than analyzing the degree of coercion, the Tenth Circuit focused on whether law enforcement played an active role in continuing the interview and whether there was "some break in the interrogation." *Id.* at 911.

Applying that analysis here, Sullivan did not pause or suspend the interrogation after Coriz invoked his right to silence; rather, she played an active role in continuing the interview. Coriz could not have reopened another conversation when the previous conversation begun by Sullivan had not ended. Any pressure appears to be too much after the right to silence or request for counsel has been invoked. Instead, under the Supreme Court's "bright-line" rule in *Edwards*, police must scrupulously adhere to a request for silence, stop the interrogation, and give space to

a suspect to reinitiate the conversation on his own. Where police offer no break, the courts have found a Fifth Amendment violation. Based on the evidence, the Court concludes that Defendant unambiguously invoked his right to remain silent, Sullivan did not scrupulously honor his request, and Defendant resumed the conversation only after Sullivan's pressure, which does not constitute a valid waiver of his invocation. *Cf. United States v. McCarthy*, 382 F. App'x 789, 791-92 (10th Cir. June 16, 2010) (holding that officers failed to scrupulously honor defendant's request to cut off questioning when they continued to discuss the consequences of cooperating or refusing to cooperate after defendant stated "I don't want nothing to say to anyone"); *Rambo*, 365 F.3d at 911 ("When Rambo stated that he did not want to discuss the robberies, Moran made no move to end the encounter. Instead he acknowledged Rambo's request, but told Rambo that he would be charged with two aggravated robberies and that other agencies would want to speak with Rambo. Those comments reflect both further pressure on Rambo to discuss the crimes and a suggestion that despite Rambo's present request to terminate discussion of the topic, he would be questioned further."). The Court therefore concludes that all statements made after his invocations of his right to silence must be suppressed.[2]

### B.  Voluntariness of Confession

Statements made by a defendant under circumstances violating *Miranda* may nonetheless be admissible for impeachment if their trustworthiness satisfies legal standards. *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978). "But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law, 'even though there is ample evidence aside from the confession to support the conviction.'" *Id.* at 398 (quoting *Jackson v. Denno*, 378 U.S. 368, 376 (1964)) (italics in original). Defendant argues his confession was the product of

---

[2] In light of this ruling, the Court does not need to consider Defendant's alternative argument that his subsequent request to call his girlfriend constituted an unambiguous invocation of his right to remain silent.

coercion; therefore, the Court must consider whether Coriz's statements were the product of a rational intellect and free will. *See id.*

The test of voluntariness is based on the totality of the circumstances, considering both the characteristics of the defendant and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1976); *Lopez*, 437 F.3d at 1063. The court must determine whether the defendant's confession is the product of an essentially free and unconstrained choice or if his will was overborne by physical or psychological coercion, threats, or by improper inducement. *See Lopez*, 437 F.3d at 1063; *United States v. Erving L.*, 147 F.3d 1240, 1248-49 (10th Cir. 1998). A confession is only involuntary if the police use coercive activity to undermine the suspect's ability to exercise free will. *Erving L.*, 147 F.3d at 1249.

No single factor is determinative in the voluntariness inquiry. *Lopez*, 437 F.3d at 1063. Relevant factors include (1) the suspect's age, education, and intelligence; (2) whether the suspect has been arrested and given *Miranda* warnings on earlier occasions, indicating previous experience with the criminal justice system; (3) the length of the detention and questioning; (4) the nature of the detention and questioning, such as whether threats or promises of leniency were made; (5) any advice of a suspect's constitutional rights; (6) the use of physical punishment; and (7) whether the suspect confessed to the crime or consistently denied any involvement in the crimes throughout the interview. *See Schneckloth*, 412 U.S. at 226; *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006); *Lopez*, 437 F.3d at 1063-65; *United States v. Chalan*, 812 F.2d 1302, 1307-08 (10th Cir. 1987). A suspect's personal characteristics are only relevant if the court first concludes that the officer's conduct was coercive. *Lopez*, 437 F.3d at 1064.

As for the nature of the questioning, promises of leniency are relevant in determining

whether a confession was involuntary and may render a confession coerced. *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997), *overruling on other grounds recognized by Estate of Papadakos v. Norton*, 663 F. App'x 651, 657 (10th Cir. Oct. 13, 2016) (unpublished). The court must initially determine whether a promise of leniency was made to the defendant or if the defendant reasonably believed that such a promise had been made. *See United States v. Garot*, 801 F.2d 1241, 1244-45 (10th Cir. 1986). If so, the court must determine whether the inducing promise was coercive -- whether the accused was so gripped by a hope of leniency that he did not or could not freely and rationally choose among available courses of action. *See id.* at 1245.

Coriz voluntarily agreed to take the polygraph test and was given written *Miranda* warnings, which he signed. *See* Gov.'s Ex. 2, ECF No. 35-2. That he knew and understood his rights and went to the test voluntarily generally supports a finding of voluntariness of his statements; but in this case, the fact that Sullivan did not scrupulously honor Coriz's repeated invocations of this *Miranda* right to silence weighs strongly in favor of a finding of coercion.

Although Sullivan did not use any physical punishment against Coriz, Sullivan repeatedly pressured Coriz to confess by telling him he failed the test. Although she knew or should have known the results were inconclusive under her own scoring system, Sullivan told him it was not even close. *See* Interview Tr. 2:13. The use of the polygraph test added to the pressure of the interrogation. Coriz initially denied having committed the crimes, but confessed only after Sullivan did not adhere to his request to stop talking and after Sullivan repeatedly and misleadingly told him he failed the polygraph test. *See* June 14, 2018 Hr'g Tr. 104:18-107:14.

"It is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him." *Lopez*, 437 F.3d at 1065 (quoting *Clanton*, 129 F.3d at 1158). However, an agent's misrepresentation of the evidence

against the defendant together with a promise of leniency if the defendant confessed may be sufficient circumstances to overbear the defendant's will and make his confession involuntary. *See id. See also Clanton*, 129 F.3d at 1159 ("Though the lies themselves are not unconstitutional, a reasonable official should have been aware that adding the lies to the apparent promises would make it more likely that the confession would be considered involuntary."). Whether a statement was a promise of leniency is a factual question to resolve. *Lopez*, 437 F.3d at 1064. Vague and non-committal promises do not render a confession coerced. *See id.* at 1064-65.

In this case, Sullivan repeatedly urged Coriz to admit what he had done so that he could get psychological counseling and/or therapy. *See* June 14, 2018 Hr'g Tr. 107:15-25; Interview Tr. 19:21-21:10, 22:5-8, 23:10-14, 30:1-2, 37:13-23, 52:5-10, 53:1-2, 56:1-10. At one point, Sullivan suggested that he should take responsibility, get help, and try to stay out of prison, if he can. Interview Tr. 20:25-21:2. She later said that no one was trying to put him in prison. *See id.* 21:25-22:1. Subsequently, Sullivan explained, "We address the problem. We get them help to stay with their family." *Id.* 30:19-20. Sullivan told him she could not "defend" him and "sit next to" him if he walked out of there. *See id.* 38:5-8. Although Sullivan's statements may be too vague to constitute a promise of leniency, her statements emphasized getting him counseling or therapy if he confessed, and minimized the prospect of prison. Sullivan's statements thus contributed to the pressure on Coriz.

Sullivan also made some statements that Coriz could reasonably construe as threatened action if he failed to confess. Sullivan suggested that Coriz's community would be told he failed the test. *See* Video at 18:47-18:58. Sullivan also indicated that Jojola would tell Coriz's girlfriend about all the allegations if he did not cooperate. *See* Interview Tr. 20:10-21:3.

It is the combination of evidence of psychological pressure that crosses the threshold to

coercion: misrepresenting that Coriz failed the polygraph and that it was not even close; repeatedly suggesting that he could get help and therapy, rather than prison if he confessed; suggesting agents would tell his community he failed the polygraph test if he did not confess; and most significantly, not ending the interview when Coriz said he did not want to say anything more. The personal characteristics of Coriz do not mitigate the coercion, as he has only an 11th grade education. Although Coriz understood his rights and had invoked his rights on prior occasions, in this case when he invoked his right to not say anything more, Sullivan did not scrupulously honor his rights. For all the foregoing reasons, the Court finds that the Government has not met its burden of persuasion to show that Coriz's confession was made voluntarily.

**IT IS THEREFORE ORDERED** that Defendant Tyrone Coriz's Motion to Suppress Statement (**ECF No. 31**) is **GRANTED**.

_____

**UNITED STATES DISTRICT JUDGE**